IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ZHOU JIE PLANT, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:08cv374 (TSE/JFA) |
| v. | ) |
| | ) Consolidated with |
| MERRIFIELD TOWN CENTER | ) Civil Action No. 1:08cv566 |
| LIMITED PARTNERSHIP, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

On March 18, 2010 the Honorable T.S. Ellis, III referred this matter to the undersigned

pursuant to 28 U.S.C. § 636(b)(1)(B) for a report and recommendation containing factual

findings and legal conclusions concerning all outstanding issues for trial, including (i) whether

each plaintiff has proven that he or she is entitled to rescission of the Unit Purchase Agreement

to which he or she is a party, (ii) whether the defendants have proven that an affirmative defense

applies to prohibit rescission with respect to each plaintiff, and (iii) whether each plaintiff has

proven entitlement to any other remedy. (Docket no. 217 p. 35). The District Judge indicated

that the magistrate judge may conduct evidentiary hearings and all other proceedings necessary

in order to prepare a report and recommendation.

Pursuant to this Order, the undersigned conducted an evidentiary hearing on June 28 and

29, 2010. On July 20, 2010 the defendants filed their proposed findings of fact and conclusions

of law (Docket no. 253) and the plaintiffs filed their proposed findings of fact and conclusions of

law (Docket no. 254). In accordance with the referral from the District Judge, the undersigned

files this report and recommendation.

## Procedural Background

On April 17, 2008, plaintiff Plant filed a complaint against Merrifield Town Center Limited Partnership ("Merrifield") on behalf of herself and "on behalf of a class of persons consisting of contract purchasers of condominium units in the Virginia condominium regime named 'Vantage at Merrifield.'" (Docket no. 1). On May 12, 2008 an amended complaint was filed by Plant and eight other plaintiffs "on behalf of themselves and on behalf of a class of persons consisting of contract purchasers of condominium units in the Virginia condominium regime named 'Vantage at Merrifield, a Condominium.'" (Docket no. 2). The amended complaint asserted claims for: (i) violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1701 *et seq.*; (ii) conspiracy to injure plaintiffs' reputation, trade, business or profession pursuant to Va. Code Ann. § 18.2-499 *et seq.*; (iii) breach of contract; and (iv) return of deposits. (Docket no. 2). The amended complaint named five defendants: Merrifield; Uniwest Group, LLC; Uniwest Development, LLC; Michael D. Collier; and Walker Title & Escrow Company, Inc. (Docket no. 2). By an Order entered on September 19, 2008, the Court granted plaintiffs' request to withdraw Count Two asserting a claim under Va. Code Ann. § 18.2-499 *et seq.* (Docket no. 22).

On November 6, 2008, the Court granted plaintiffs' motion to consolidate *Kim v. Merrifield Town Ctr. Ltd. P'ship*, Civil Action No. 1:08cv566, with this case. (Docket no. 32). The original *Kim* complaint was filed on June 3, 2008 and identified over 100 plaintiffs, including the nine plaintiffs named in the *Plant* amended complaint. (*Kim* Docket no. 2). The same four claims asserted in the *Plant* action were asserted in the *Kim* action against the same defendants and two additional defendants, McWilliams-Ballard, LLC and Jonnie Jameson. (*Kim* Docket no. 2). On June 6, 2008, an amended complaint was filed in *Kim* including additional

plaintiffs. (*Kim* Docket no. 1).[1]  On September 19, 2008, the Court granted plaintiffs' request in *Kim* to withdraw Count Two asserting a claim under Va. Code Ann. § 18.2-499 *et seq.* (*Kim* Docket no. 48).

Following the consolidation of the *Plant* and *Kim* cases, the Court entered an Order on November 12, 2008 denying the plaintiffs' motion for class certification. (Docket no. 35). Class certification was denied on the grounds that the plaintiffs failed to satisfy the threshold requirements of Fed. R. Civ. P. 23(a) (numerosity, commonality, typicality in the representative plaintiff's claims, and adequacy of the representative plaintiff's ability to protect the interests of the class) and the additional requirement that the proposed class fall within a Rule 23(b) category. (*Id.*). Thus, the Court found that the proposed class met none of the requirements of Fed. R. Civ. P. 23. (*Id.*).

On December 16, 2008, the Court granted plaintiffs' request to withdraw Count Three for breach of contract and to dismiss the claims against defendants McWilliams-Ballard, LLC and Jonnie Jameson with prejudice. (Docket no. 39). On December 19, 2008, the Court entered an Order denying the motions for leave to intervene that had been filed and granting plaintiffs leave to file a second amended complaint "adding any additional plaintiffs, but not amending in any other respect." (Docket no. 43). On January 12, 2009, a second amended complaint was filed. (Docket no. 47). The second amended complaint was brought on behalf of a total of 126 plaintiffs involving 93 different units. (Docket no. 47, Exs. A, B). As shown in exhibit A to the second amended complaint, there are 66 separate units that were subject to 24-month contracts which involve 92 plaintiffs since 26 of these contracts had joint purchasers. As shown in exhibit

---

[1]  The amended complaint was filed again on June 19, 2008 (*Kim* Docket no. 6) noting that it was corrected at ECF request. Minute entries on the docket sheet on June 10 and 13, 2008 indicate that the original filing of the amended complaint did not include the correct signature block and there was no case number on the pleading. Counsel was notified by the Clerk's office to refile the document.

B to the second amended complaint, there are 27 separate units that were subject to 36-month contracts which involve 34 plaintiffs since seven of those contracts had joint purchasers. The second amended complaint contained counts for violation of the ILSFDA, breach of contract and return of deposits against the same five defendants named in the first amended complaint filed by the *Plant* plaintiffs. (Docket no. 47). Count Two of the second amended complaint alleging breach of contract was dismissed since that claim had been withdrawn by the plaintiffs previously and the inclusion of that claim in the second amended complaint exceeded the scope of the Court's Order granting leave to file the second amended complaint. (Docket no. 69).

By an Order entered on March 16, 2009, the Court awarded the plaintiffs partial summary judgment on Count One (violation of the ILSFDA) "insofar as (i) the 24-month UPA sales contracts are not exempt, pursuant to 15 U.S.C. § 1702(a)(2), from ILSFDA's reporting and disclosure requirements; (ii) the 36-month UPA sales contracts are not exempt, pursuant to 15 U.S.C. § 1702(b)(1), from ILSFDA's reporting and disclosure requirements; and (iii) it is undisputed that defendants failed to comply with ILSFDA's reporting and disclosure requirements with respect to all sales contracts at issue." (Docket no. 69).

As directed in the Order entered on March 24, 2009 (Docket no. 70), on June 1, 2009, the undersigned magistrate judge submitted a report and recommendation concerning the appropriate remedy, if any, for the plaintiffs under the ILSFDA. (Docket no. 82). Both parties filed objections to the first report and recommendation. (Docket nos. 83, 85). On July 21, 2009, the Court entered an Order adopting in part and modifying in part the first report and recommendation. (Docket no. 95). On the same day, the Court referred this matter to the undersigned for an additional report and recommendation addressing five specific issues. (Docket no. 96).

4

Following the July 21, 2009 referral, the undersigned magistrate judge held a status conference with counsel for the parties and a briefing schedule was established and a hearing was set to allow the parties an opportunity to be heard on the referred issues. (Docket no. 101). On August 28, 2009, each party filed an opening brief in support of their respective positions. (Docket nos. 121, 122). On September 9, 2009, the parties filed their opposition briefs. (Docket nos. 132, 133). On September 14, 2009, a hearing was held during which counsel argued their respective positions. On September 17, 2009, plaintiffs filed a supplemental memorandum. (Docket no. 147). Defendants filed a response to plaintiffs' supplemental memorandum on September 24, 2009. (Docket no. 157). On September 29, 2009 the undersigned filed a report and recommendation addressing the five issues specified by the District Judge. (Docket no. 162). Each party filed objections to that report and recommendation. (Docket nos. 177, 179).

On October 7, 2009, the Court entered an Order noting that plaintiffs had filed a notice of an involuntary petition in bankruptcy against Merrifield and staying the matter against Merrifield pursuant to 11 U.S.C. § 362(a). (Docket no. 168). In that Order the Court also stayed the proceedings as to the other defendants under Federal Rule of Civil Procedure 19(b). (*Id.*). On December 7, 2009, defendants filed a motion to reopen case (Docket no. 173) that was granted by the Court on December 7, 2009 (Docket no. 175).

On December 7, 2009 defendants filed a renewed/supplemental third motion for sanctions against the plaintiffs based on their failure to comply with previous discovery orders and misrepresentations made to the Court. (Docket no. 174). Following briefing (Docket nos. 171, 180, 181) and a hearing in which defendants' counsel appeared but plaintiffs' counsel did not appear (Docket no. 184), the undersigned issued a report and recommendation on December 23, 2009. (Docket no. 186). In that report the undersigned recommended that the claims

asserted by all the plaintiffs, other than the 23 plaintiffs who had provided sworn answers to interrogatories by October 2, 2009, be dismissed with prejudice and that the defendants be awarded their costs and attorney's fees incurred in filing the third motion for sanctions pursuant to Federal Rule of Civil Procedure 37(d)(3) since the failure to comply with the Court's earlier orders was not substantially justified and no other circumstances exist that would make an award of expenses unjust. (*Id*.). Plaintiffs filed an objection to that report and recommendation on January 6, 2010. (Docket no. 195).

On January 4, 2010 plaintiffs filed a motion for partial summary judgment (Docket no. 192) and on the following day a memorandum in support of that motion (Docket no. 193). On January 20, 2010 plaintiffs filed a second memorandum in support of their motion for summary judgment. (Docket no. 203). Defendants filed a motion to strike the motion for partial summary judgment along with a supporting memorandum. (Docket nos. 204, 205).

On January 29, 2010 and February 12, 2010 the District Judge heard argument on the various motions pending at that time. (Docket nos. 210, 215). On March 18, 2010 a Memorandum Opinion (Docket no. 217) and Order (Docket no. 218) were entered in which the September 29, 2009 and December 23, 2009 reports and recommendations were adopted in part and modified in part; the defendants were awarded their costs, including reasonable attorney's fees, incurred in filing their third motion for sanctions; and the plaintiffs' motion for partial summary judgment was denied. Pursuant to that Order, the 82 plaintiffs who failed to provide interrogatory responses by December 18, 2009 were dismissed from this action.[2] This matter was referred to the undersigned for a report and recommendation concerning the costs, including attorney's fees, to which the defendants are entitled in connection with their third motion for

---

[2] After those plaintiffs were dismissed, the remaining claims involve 30 separate Unit Purchase Agreements and 38 plaintiffs.

sanctions and a report and recommendation containing findings and conclusions on all remaining triable issues. (Docket no. 218).

After allowing additional briefing by the parties, the undersigned prepared a report and recommendation as to the amount of attorney's fees and costs the defendants should be awarded in connection with their third motion for sanctions. (Docket no. 234). Plaintiffs objected to that report and recommendation (Docket no. 239) and those objections were sustained in part and overruled in part (Docket no. 241). A judgment in the amount of $9,066.99 was awarded to the defendants on May 25, 2010. (Docket no. 242).

Pursuant to the Order of referral concerning all outstanding issues for trial, a status conference with counsel was held and an evidentiary hearing was set for June 28 and 29, 2010. (Docket nos. 221, 224). Of the remaining plaintiffs, 25 plaintiffs appeared and testified at the evidentiary hearing, many with the assistance of a Korean interpreter.[3] Defendant Michael Collier also testified at the evidentiary hearing. During the evidentiary hearing the following exhibits were the subject of testimony by the witnesses who appeared and testified: Exhibits 1-3, 5-6, 9-12, 14-23, 25-30 (documents relating to each plaintiff including the Unit Purchase Agreement and related documents, specific unit purchaser correspondence, receipt of project documents and the residential use permit); 31 (May 24, 2005 Public Offering Statement); 33 (Merrifield Town Center flyers); 34 (the assignment of claims by Tia Young Johng); 40 (project construction schedules); 41 (Merrifield Town Center project timeline); 45 (letter to Clark Realty Capital dated July 8, 2005); 46 (site permit) and 47 (building permits). In addition to the testimony presented and the exhibits offered into evidence during the hearing, the parties agreed

---

[3] Where there were joint purchasers listed on a Unit Purchase Agreement, only one purchaser testified. There were five Unit Purchase Agreements remaining in the case for which no one appeared to testify. (Yang Ja Bae, Unit S326; Rahul Chaudhry, Unit S513; Raj Chaudhry, Unit S508; Dustin Han and Ae Ju Lee, Unit S203; and Chris Padden, Unit S308).

to include in the record the stipulated facts that had been filed with the Court on February 11, 2009 (Docket no. 60).

On July 20, 2010 plaintiffs and defendants filed their respective proposed finding of fact and conclusions of law. (Docket nos. 254, 253). On August 10, 2010 plaintiffs requested leave to file an opposition to the defendants' proposed findings of fact and conclusions (Docket no. 255) which was denied on August 13, 2010 (Docket no. 257).

## Proposed Factual Findings

The facts surrounding plaintiffs' claims and the defendants' defenses have been discussed fully by the Court in its earlier Opinions and Orders. For the most part, there is no dispute as to the relevant facts underlying the plaintiffs' claims and the defendants' defenses. However, given the broad scope of the referral, a recitation of the relevant factual findings will be provided.

### Facts Stipulated to by the Parties (Docket no. 60)

As set forth in the joint stipulated facts filed on February 11, 2009 (Docket no. 60) and made a part of the record in the evidentiary hearing:

1. The Condominium project known as "Vantage at Merrifield, a Condominium" has at all times been a project containing more than twenty-five condominium units.

2. All of the approximately 279 condominium units in the Vantage Condominium were built as part of a single condominium project.

3. All of the units in the Vantage Condominium were offered for sale as parts of a single condominium project.

4. No statement of record as defined in ILSFDA was ever approved by HUD regarding the Vantage Condominium.

5. No property report as defined in ILSFDA was ever approved by HUD with respect to the Vantage Condominium.

6. Merrifield Town Center Limited Partnership entered into written contracts for the sale of units in the Vantage Condominium Project to the Plaintiffs.

7. All but ninety-seven contracts for the sale of units in the Vantage Condominium were the "Twenty-Four Month Contract".

8. Ninety-seven contracts for the sale of units in the Vantage Condominium were the "Thirty-Six Month Contract".

9. All deposits paid by Plaintiffs were made pursuant to the terms of either the Twenty-Four Month Contract or the Thirty-Six Month Contract, as applicable.

10. Merrifield Town Center used two (2) form Agreements for the Project, one having an outside settlement date of 24 months from ratification and the other having an outside settlement date of 36 months from ratification, both contacts containing language regarding time extensions for delays.

11. In early May 2005 and before the first Agreement was executed in connection with the Project, Merrifield Town Center submitted a pair of form Agreements to the Virginia Real Estate Board ("VREB") for review and approval.

12. Shortly thereafter, those forms were duly approved for use by the VREB.

13. Merrifield Town Center continued to revise its form Agreements and, also in May, 2005, submitted revisions of the two forms of its purchase agreements to the VREB for review and approval.

14. In both submissions to the VREB, Merrifield Town Center submitted both clean and black-lined versions of the documents in order to highlight the revisions being made.

15. The revised form purchase agreements were approved by the VREB by letter dated July 28, 2005.

16. In May of 2005, Merrifield Town Center held an open house/preview party for the Project which was attended by as many as 3,500 potential purchasers seeking to place orders for the available units.

17. The Project was planned for two buildings (North and South) with the construction on the South building to proceed first and the construction of the North building to proceed on a schedule that was expected to be some two months or so later than the South building.

18. Throughout the summer of 2005, Merrifield Town Center experienced unexpected difficulties in obtaining the site permits necessary to commence construction.

19. Once the County approval was in place, Merrifield Town Center completed the process of ratifying the pending 24-month Agreements in the August/September 2005 time frame.

20. By June 2006, Merrifield Town Center had encountered more contaminated soils than it had originally projected, resulting in a delay of 2-3 months in the excavation and preparation of the site for development.

21. Groundwater conditions at the site, beyond those Merrifield Town Center had projected, also contributed to those delays.

22. The bearing capacity of the soils was far worse than Merrifield Town Center had projected. This necessitated the redesign of the entire foundation system for the North building to change from typical spread footings to deep caissons.

23. Merrifield Town Center did not have to resort to the use of caissons for the South building, but it was forced to enlarge certain of its footings. Merrifield Town Center calculates the delays associated with these conditions to be approximately 3 months.

24. In the fall of 2005 Merrifield Town Center wrote a letter to HUD requesting an advisory opinion.

25. Merrifield Town Center submitted revised form Agreements, which had been used for the sale of all the Vantage units sold, to the Department of Housing and Urban Development ("HUD") as part of that request for an advisory opinion.

26. By letter dated November 2, 2005, HUD gave Merrifield Town Center an advisory opinion.

### Facts Established During the Evidentiary Hearing

During the evidentiary hearing on June 28 and 29, 2010 the undersigned heard testimony from 25 of the plaintiffs and the testimony of Michael D. Collier, a defendant and representative of the other Merrifield-related entities. The following exhibits were discussed during the evidentiary hearing and admitted into evidence: Exhibits 1-3, 5-6, 9-12, 14-23, 25-30 (documents relating to each plaintiff including the Unit Purchase Agreement and related documents, specific unit purchaser correspondence, receipt of project documents and the residential use permit); 31 (May 24, 2005 Public Offering Statement); 33 (Merrifield Town Center flyers); 34 (the assignment of claims by Tia Young Johng); 40 (project construction schedules); 41 (Merrifield Town Center project timeline); 45 (letter to Clark Realty Capital dated July 8, 2005); 46 (site permit) and 47 (building permits). A brief summary of the relevant testimony from each of the witnesses will be discussed below with references to the exhibits used during that testimony. These summaries will be listed in the order in which the witnesses

testified and the time-stamp given for that testimony in the event there is a need to review the recording of the hearing. Following the summary of each witnesses' testimony, a description of the relevant portions of the admitted exhibits will be provided.

**Zhou Jie Plant** (Unit S103) (6/28/2010, 10:11 a.m.)

Ms. Plant testified that she signed the Unit Purchase Agreement ("UPA") contained in Exhibit 27A (a 24-month contract to purchase Unit S103) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($19,445 and $7,778) contained in Exhibit 27A to Vantage Condominium. Ms. Plant acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it word for word. She also testified that she did review, but did not read word for word, two binders of documents at the Merrifield sales office which included the condominium documents and information concerning the development. She testified that she did read the 11-page UPA before she signed it. She had a realtor assisting her in this transaction but did not have a lawyer review the UPA before she signed it.

Ms. Plant decided shortly before June 2007 that she did not want to complete the purchase of the unit because she did not believe it would be completed within the 24-month time period. In the fall of 2007 she contacted her current counsel and he wrote a letter to Merrifield seeking the return of her deposits. (Exhibit 27B). Ms. Plant testified that if her unit had been completed within the expected 24-month timeframe and if it had not declined in value she probably would have gone to closing.

**Jin O'Neill** (Unit N510) (6/28/2010, 10:30 a.m.)

Ms. O'Neill testified that she signed the UPA contained in Exhibit 23A (a 36-month contract to purchase Unit N510) and pursuant to that agreement she provided the two checks

payable to Walker Title and Escrow ($35,595 and $14,238) contained in Exhibit 23A to Merrifield. As shown in Exhibit 23A, Oriole O'Neill was also a signatory to the UPA. Ms. O'Neill acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the UPA but that she did not read it. She did not read the UPA word for word before she signed it but she did review the major terms. Ms. O'Neill testified that she completed the Vantage Finishes Options sheet in Exhibit 23A in which she made several selections of options for the unit.

Ms. O'Neill testified that when she received a copy of the revised condominium documents (Exhibit 23C, March 5, 2008 letter) she sent Merrifield a certified letter within ten days indicating she wanted to cancel her contract. She also testified that she decided not to complete the purchase of the unit when she got notice of the walk through (Exhibit 23B, June 4, 2008 letter) because she had learned that some of the units in the development were being rented as apartments and that the value of the unit had gone down. Ms. O'Neill stated that if the unit she had contracted to purchase in 2005 was the same value or a higher value at the time she was notified of the closing, she probably would have gone to closing. She also testified that she was willing to buy the unit but not at the price she contracted for and that she approached Merrifield in 2008 about lowering the price on the unit and was told no.

**Young Min Seo** (Unit N422) (6/28/2010, 10:56 a.m.)

Ms. Seo testified with the assistance of an interpreter that she signed the UPA contained in Exhibit 29A (a 24-month contract to purchase Unit N422) and pursuant to that agreement she provided the two checks payable to Walker Title ($30,645 and $12,258) contained in Exhibit 29A to Merrifield. Ms. Seo stated that she can read only a little English. She acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the

UPA but that she did not remember reading it or having anyone else read it to her. She also did not read the UPA before she signed it but she did have a realtor explain parts of it to her but she did not have it translated word for word. On August 15, 2006 Ms. Seo signed a Unit Purchase Agreement Amendment #1 and completed the Vantage Finishes Options sheet selecting some finishes for the unit. (Exhibit 29A). She also testified that she received newsletters about the project from Merrifield after signing the UPA. (Exhibit 33).

Ms. Seo testified that she does not recall when she decided not to complete the purchase of the unit. She stated that she decided not to buy the unit because it was not ready at the time that it was expected to be completed. She also testified that if the value of the unit had increased instead of decreasing and if the value of the property she intended to sell before moving had not gone down, she would have bought the unit.

**Tia Young Johng** (Unit S313) (6/28/2010, 11:47 a.m.)

Ms. Johng testified that she signed the UPA contained in Exhibit 15A (a 24-month contract to purchase Unit S313) and pursuant to that agreement she provided the two checks payable to Walker Title ($18,945 and $7,578) contained in Exhibit 15A to Merrifield. Ms. Johng was a licensed realtor at the time she entered into the UPA. Ms. Johng acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the UPA but that she did not read it. She did not read the UPA word for word before she signed it. On June 27, 2006 Ms. Johng signed a Unit Purchase Agreement Amendment #1 and completed the Vantage Finishes Options sheet selecting some finishes for the unit. (Exhibit 15A). From that time forward she knew Merrifield was completing the unit based on the selections she made. She also testified that she received newsletters about the project from Merrifield after signing the UPA.

14

Ms Johng testified that she decided not to complete the purchase of the unit when she got notice of the walk through. Around that time she had an appraisal done and learned that the value of the unit had decreased substantially. Because of the lower appraisal, she was unable to obtain a loan to purchase the property. She would have purchased the unit if the purchase price was the same as the appraised value.

Ms. Johng testified that she executed an Assignment of Claims (Exhibit 34) in which she assigned her rights in the claims being asserted against Merrifield in this action.

**Malini N. Raswant** (Unit S500) (6/28/2010, 12:10 p.m.)

Ms. Raswant testified that she signed the UPA contained in Exhibit 28A (a 36-month contract to purchase Unit S500) and pursuant to that agreement she provided the two checks payable to Walker Title ($45,895 and $18,358) contained in Exhibit 28A to Merrifield. Ms. Raswant acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the UPA but that she did not read it. She did not read the UPA word for word before she signed it. She testified that it would have influenced her decision to enter into the contract if she had been told it might be difficult or impossible to resell her unit if there was competition with Vantage in reselling units or if real estate brokers would not want to list her unit.

While there was some confusion in Ms. Raswant's testimony, it appears she decided not to complete the purchase of the unit in March 2008, soon after she received a copy of the recorded condominium documents (Exhibit 28C). She initially attempted to cancel her agreement based on what she believed were material differences in the condominium documents. She decided not to complete the purchase of the unit because the value had fallen and she was

not able to finance the purchase. If the value of the unit had not decreased and she could have obtained a loan, she would have purchased the unit.

**Mahbod Hashemzadeh** (Unit S417) (6/28/2010, 12:29 p.m.)

Mr. Hashemzadeh testified that he signed the UPA contained in Exhibit 14A (a 36-month contract to purchase Unit S417) and pursuant to that agreement he provided the two checks payable to Walker Title ($62,340 and $12,468) contained in Exhibit 14A to Vantage. Mr. Hashemzadeh has been a licensed realtor for 20 years and he was provided "friends and family" treatment for his purchase. Mr. Hashemzadeh acknowledged that he was provided with a copy of the Public Offering Statement (Exhibit 31) but that he did not read it in 2005. He did not read the UPA word for word before he signed it. He testified that it would have influenced his decision to enter into the contract if he had been told it might be difficult or impossible to resell his unit if there was competition with Vantage in reselling units or if real estate brokers would not want to list his unit.

On February 18, 2008 Mr. Hashemzadeh wrote to Mr. Collier requesting that he be released from the UPA because of family issues and his inability to obtain financing for the purchase. (Exhibit 14B). He testified that if the value had not decreased and the lending program that he had arranged in 2005 was available, he would have purchased the unit.

**Mona Abuhamda for Ahlam Abdel Meguid Sharaf Aldin** (Unit N425) (6/28/2010, 12:48 p.m.)

Ms. Abuhamda testified that she signed the UPA contained in Exhibit 2A (a 24-month contract to purchase Unit N425) for her mother (Ahlam Abdel Meguid Sharaf Aldin) pursuant to a power of attorney. (Exhibit 2A). Pursuant to the UPA Ms. Abuhamda provided the two checks payable to Walker Title ($28,895 and $11,558) contained in Exhibit 2A to Vantage. Ms. Abuhamda acknowledged that she was provided with a copy of the Public Offering Statement

(Exhibit 31) before she signed the UPA but that she did not read it. She also did not read the UPA word for word before she signed it. In the summer of 2006 Ms. Abuhamda signed a Unit Purchase Agreement Amendment #1 and completed the Vantage Finishes Options sheet selecting some finishes for the unit. (Exhibit 2A). From that time forward she knew Merrifield was completing the unit based on the selections she made.

Ms. Abuhamda testified that she decided not to complete the purchase of the unit sometime in 2008 when she got notice of the walk through. (Exhibit 2B). The reasons she stated for that decision were that the value had gone down and she did not like the location because of the number of rental units and students occupying the building. She no longer believed the location was suitable for her parents. She did testify that if the value of the unit had increased and not decreased she probably would have gone to closing.

**Lai Chan** (Unit N504) (6/28/2010, 2:01 p.m.)

Ms. Chan testified that she signed the UPA contained in Exhibit 6A (a 36-month contract to purchase Unit N504) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($27,245 and $10,918) contained in Exhibit 6A to Vantage. As shown in Exhibit 6A, Michael Huang, Ms. Chan's husband, was also a signatory to the UPA. Mr. Huang was a licensed realtor at the time the UPA was signed. Ms. Chan acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the UPA but that she did not read it at the time. She did skim the Public Offering Statement when she went home. She did not read the UPA word for word before she signed it. In the summer of 2006 Ms. Chan completed the Vantage Finishes Options sheet in Exhibit 6A in which she made several selections of options for the unit. She testified that it would have influenced her decision to enter into the contract if she had been told it might be difficult or impossible to resell her unit

17

if there was competition with Vantage in reselling units or if real estate brokers would not want to list her unit. She also testified that she received newsletters about the project from Merrifield after signing the UPA. At the time she entered into the UPA she was living in a four bedroom, detached home with her husband and two children, an infant and a four-year old. The unit she contracted to purchase had two bedrooms.

Ms. Chan testified that she received the updated condominium documents in March 2008 (Exhibit 6C, March 5, 2008 letter) and after reviewing those documents she decided to cancel her contract because she thought there were material differences between the documents she received at closing and the documents she received in March 2008. Those differences included a reduction in the common elements and a change in the commercial parking space. She testified that she sent a letter to Merrifield within ten days of receiving the updated documents indicating that she wanted to cancel her contract. After receiving the May 21, 2008 letter notifying her of the time for closing, she had her lawyer send a letter to Merrifield. (Exhibit 6B). The letter sent by her counsel only addressed claims under the ILSFDA and did not address the condominium documents. Ms. Chan stated that the decrease in the value of the unit was one reason she did not go to closing and that if the value had increased she might have gone to closing.

**Young Sin Yoo** (Unit N323) (6/28/2010, 2:25 p.m.)

Mr. Yoo testified that he signed the UPA contained in Exhibit 30A (a 24-month contract to purchase Unit N323) and pursuant to that agreement he provided the two checks payable to Walker Title and Escrow ($28,295 and $11,318) and the check in the amount of $785 payable to Merrifield contained in Exhibit 30A to Vantage. As shown in Exhibit 30A, Hei Sook Yoo, Mr. Yoo's wife, was also a signatory to the UPA. Mr. Yoo acknowledged that he was provided with a copy of the Public Offering Statement (Exhibit 31) but that he did not read it before he signed

the UPA. He did look at it after he went home. He also did not read the UPA word for word before he signed it. On June 27, 2006 he signed the Unit Purchase Amendment #1 and completed the Vantage Finishes Options sheet in Exhibit 30A in which he made several selections of options for the unit. After that time he assumed Merrifield was building the unit to include the options he selected. He testified that it would have influenced his decision to enter into the contract if he had been told it might be difficult or impossible to resell his unit if there was competition with Vantage in reselling units or if real estate brokers would not want to list his unit.

Mr. Yoo testified that he decided not to complete the purchase of the unit in the spring of 2007. He stated that he sent a letter to Merrifield in September 2007 saying he did not want to proceed with the purchase. He made that decision based on the downturn in the market, the problems in selling his home in Maryland and the delay in delivery of the unit. On April 21, 2008 he wrote a letter to Merrifield indicating that the lender had rejected his loan application and that he could not afford to purchase the unit. (Exhibit 30B).

**Seung Cha Cho** (Unit N507) (6/28/2010, 2:45 p.m.)

Ms. Cho testified with the assistance of an interpreter that she signed the UPA contained in Exhibit 10A (a 36-month contract to purchase Unit N507) and pursuant to that agreement she provided the two checks payable to Walker Title ($67,140 and $13,428) contained in Exhibit 10A to Merrifield. She stated that she was buying this unit as an investment. Ms. Cho acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) before she signed the UPA but that she did not read it or have anyone read it to her. She did not read the UPA word for word before she signed it and she did not have anyone read it to her. On August 10, 2006 she signed the Unit Purchase Amendment #1 and completed the Vantage

Finishes Options sheet in Exhibit 10A in which she made several selections of options for the unit. After that time she assumed Merrifield was building the unit to include the options she selected.

Ms. Cho testified that she decided not to complete the purchase of the unit in May 2008. She said rumors were spreading that the project was being turned into apartments. She stated that she did not know that Merrifield had the right to lease units under the UPA. She testified that one of the reasons she decided not to proceed to closing was the decrease in the value of the unit but even if the value had not decreased, she may not have closed on the unit because of the number of apartments.

**Han Ho Kim** (Unit N325) (6/28/2010, 3:07 p.m.)

Mr. Kim testified that his daughter signed the UPA contained in Exhibit 17A (a 24-month contract to purchase Unit N325) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($30,295 and $12,118) contained in Exhibit 17A to Vantage. As shown in Exhibit 17A, Sinthia Kim, Mr. Kim's daughter, was the sole, original signatory to the UPA. Mr. Kim testified that he purchased another unit (Unit N115) in his name for a price of $596,500 and made two deposits on that unit.[4] Mr. Kim testified that he was present at Merrifield when his daughter signed the UPA and that it is his daughter's signature on the UPA. He stated that he and his daughter were at the Merrifield sales office at the same time and were in separate rooms but on occasion they would talk with each other in the same room.

**Lydia Cotto** (Unit N409) (6/28/2010, 3:28 p.m.)

Ms. Cotto testified that she signed the UPA contained in Exhibit 12A (a 24-month contract to purchase Unit N409) and pursuant to that agreement she provided the two checks

---

[4] Han Ho Kim was listed as a plaintiff along with his daughter in the second amended complaint, exhibit A concerning Unit N325. No claim is made in the second amended complaint relating to Unit N115.

payable to Walker Title and Escrow ($28,545 and $11,418) contained in Exhibit 12A to Vantage. She also provided Vantage with a check in the amount of $1,600 for the options she selected in 2006. (Exhibit 12A). Ms. Cotto acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it before she signed the UPA. She also did not read the UPA before she signed it. On June 20, 2006 she signed the Unit Purchase Amendment #1 and completed the Vantage Finishes Options sheet in Exhibit 12A in which she made several selections of options for the unit. After that time she assumed Merrifield was building the unit to include the options she selected. She testified that it would have influenced her decision to enter into the contract if she had been told it might be difficult or impossible to resell her unit if there was competition with Vantage in reselling units or if real estate brokers would not want to list her unit.

In February 2008 she went to a walk through with a friend and was disappointed with what she saw during that walk through. In March 2008 she got the updated condominium documents and noticed some differences and she sent a letter to Merrifield within ten days attempting to cancel the contract. She was concerned about the property having rental units, that it was not a luxury condominium and that it did not have all the amenities she expected. She did state that the value of the unit having decreased was also a factor in her decision not to go to closing.

**Kyong Ashby** (Unit N201) (6/28/2010, 4:15 p.m.)

Ms. Ashby testified through the assistance of an interpreter that she signed the UPA contained in Exhibit 3A (a 24-month contract to purchase Unit N201) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($21,495 and $8,598) contained in Exhibit 3A to Vantage. At the time Ms. Ashby signed the UPA she was a

licensed realtor. Ms. Ashby acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it before she signed the UPA. She also did not read the UPA before she signed it. On June 29, 2006 she completed the Vantage Finishes Options sheet in Exhibit 3A in which she made several selections of options for the unit.

Ms. Ashby testified that just before her scheduled walk through in the spring of 2008 she decided not to proceed to closing on the unit. The reasons for her decision not to proceed to closing were delay in delivery of the unit, she would have difficulty in reselling the unit and the value of the unit had declined. She testified that if the value of the unit had not decreased as of the spring 2008 she would have bought the unit.

**Jung Cho** (Unit N419) (6/28/2010, 4:39 p.m.)

Mr. Cho testified that he signed the UPA contained in Exhibit 9A (a 24-month contract to purchase Unit N419) and pursuant to that agreement he provided the two checks payable to Walker Title and Escrow ($34,345 and $13,738) contained in Exhibit 9A to Vantage. He also provided Vantage with a check in the amount of $5,160 for the options he selected in 2006. (Exhibit 9A). As shown in Exhibit 9A, Annie J. Cho, Mr. Cho's wife, was also a signatory to the UPA. Mr. Cho acknowledged that he was provided with a copy of the Public Offering Statement (Exhibit 31) but that he did not read it before he signed the UPA. He also did not read the entire UPA before he signed it. On June 29, 2006 he completed the Vantage Finishes Options sheet in Exhibit 9A in which he made several selections of options for the unit.

Mr. Cho testified that when he went to the walk through in June 2008 for his unit he saw a large pole in the living room next to the window. He did not believe that the pole was in the plans he had seen before and he did not want to buy the unit because of this pole. He also stated that some other punch list type items were of concern as well.

22

**Heeyon Kim** (Unit N327) (6/28/2010, 4:49 p.m.)

Ms. Kim testified that she signed the UPA contained in Exhibit 18A (a 24-month contract to purchase Unit N327) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($24,495 and $9,798) contained in Exhibit 18A to Vantage. Ms. Kim acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it before she signed the UPA. She also did not read the entire UPA before she signed it. On June 20, 2006 she completed the Vantage Finishes Options sheet in Exhibit 18A in which she made several selections of options for the unit.

Ms. Kim said she purchased unit for her parents to live in and the delay in delivery was a significant factor in her decision not to close. Another factor was that she learned that there were rental units in the project and that she did not sign up to pay that much money for a residence in an apartment building.

**Maria Bras** (Unit S510) (6/29/2010, 10:15 a.m.)

Ms. Bras testified that she signed the UPA contained in Exhibit 5A (a 36-month contract to purchase Unit S510) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($31,320 and $12,528) contained in Exhibit 5A to Vantage. At time she signed the UPA, Ms. Bras was a licensed realtor. Ms. Bras acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it.

Ms. Bras testified that she decided not to buy the unit because she could not get financing at the time. She stated that while she was approved for financing at the time the UPA was signed, because the appraised value of the unit declined and her earnings had declined she was not able to get financing in 2007 or 2008. While Merrifield did offer to reduce the price some

amount, it was not enough for her to afford to buy the unit. Ms. Bras acknowledged that at the time she decided not to proceed to buy the unit there was no financing contingency that would give her the right to refuse to close. Ms. Bras testified that she had decided not to buy this unit before she met with her counsel and before she heard of the ILSFDA.

**Jennifer Kim** (Unit N206) (6/29/2010, 10:43 a.m.)

Ms. Kim testified through an interpreter that she signed the UPA contained in Exhibit 19A (a 24-month contract to purchase Unit N206) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($18,845 and $7,538) contained in Exhibit 19A to Vantage. At the time Ms. Kim signed the UPA, she was a licensed realtor. Ms. Kim testified the she was buying this unit for her daughter (Cynthia Moy) who was in law school in Delaware at the time and was expected to graduate in May 2007. Ms. Kim does not remember whether she was provided with a copy of the Public Offering Statement (Exhibit 31) but she identified her signature on the acknowledgement form indicating that she did receive it. She does not recall ever reading the Public Offering Statement. She also testified that she did not read the entire UPA before she signed it. On June 29, 2006 she signed the Unit Purchase Agreement Amendment #1 and completed the Vantage Finishes Options sheet in Exhibit 19A in which she made several selections of options for the unit. After that she understood that Merrifield was completing the unit based on her selections.

Ms. Kim testified that she decided not to close on the unit in June 2007 but she did not inform Merrifield of her decision. She first met with an attorney in June 2008 and at that time she learned of the ILSFDA. The decrease in the value of the unit was one reason, but not the sole reason, she did not proceed to closing. She does not know if she would have closed if the value had not decreased. In the spring of 2007 Ms. Kim's daughter decided to work in Delaware

upon graduation from law school and not return to the Washington area. Ms. Kim said that the failure to deliver the unit within 24 months was a factor in her decision in June 2007 not to close.

**Kwan Sun Kim** (Unit N318) (6/29/2010, 11:08 a.m.)

Ms. Kim testified through an interpreter that she signed the UPA contained in Exhibit 21A (a 36-month contract to purchase Unit N318) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($60,240 and $12,408) contained in Exhibit 21A to Vantage. Ms. Kim acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it.

Ms. Kim testified that she decided not to close on the unit in the end of 2007 but she did not tell anyone at Merrifield. She first met with her attorney in 2008 and at that time learned of the ILSFDA. Ms. Kim said she decided not to close because the market was going down and the value of the unit was depreciating.

**Chang Sun Lee** (Unit S413) (6/29/2010, 11:26 a.m.)

Ms. Lee testified through an interpreter that she signed the UPA contained in Exhibit 22A (a 36-month contract to purchase Unit S413) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($37,390 and $7,478) contained in Exhibit 22A to Vantage. Ms. Lee acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it.

Ms. Lee testified that she decided not to close on the unit in around May 2007 because she moved to Georgia in 2006 to start a business and the business failed. Her credit was bad and she could not get a loan. She wrote a letter to Merrifield much later stating that she did not have

the money to buy the unit. When she met with her attorney in 2008 and first learned of the ILSFDA she had already decided not to close on the unit. Ms. Lee said that her decision not to proceed to closing was based on her inability to get a loan given the change in her financial condition.

### Eunjoo Kim (Unit N312) (6/29/2010, 11:58 a.m.)

Ms. Kim testified through an interpreter that she signed the UPA contained in Exhibit 16A (a 36-month contract to purchase Unit N312) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($18,095 and $7,238) contained in Exhibit 16A to Vantage. Ms. Kim acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it.

Ms. Kim testified that she decided not to close on the unit in the end of 2007 but she did not tell anyone at Merrifield. She first met with her attorney in 2008 and at that time learned of the ILSFDA. Ms. Kim first learned that the value of the unit had decreased in 2007. She said she wanted to buy the unit for her in-laws to live there but decided not to close because her father-in-law was sick. Another reason for not closing was the value of the unit had decreased.

### Hoon Jung Park (Unit N110) (6/29/2010, 12:20 p.m.)

Mr. Park testified that he signed the UPA contained in Exhibit 25A (a 24-month contract to purchase Unit N110) and pursuant to that agreement he provided the two checks payable to Walker Title ($20,645 and $8,258) contained in Exhibit 25A to Vantage. Mr. Park acknowledged that he was provided with a copy of the Public Offering Statement (Exhibit 31) but that he did not read it before he signed the UPA. He also did not read the entire UPA before he signed it. On August 7, 2006 he signed the Unit Purchase Agreement Amendment #1 and

completed the Vantage Finishes Options sheet in Exhibit 25A in which he made several selections of options for the unit.

Mr. Park testified that he decided not to close in the spring of 2007 when he realized the project was less than half completed and the unit would not be ready within the 24-month time table. He also stated that he attempted to finance the purchase but was not able to do so because the amount of the purchase price that could be financed had decreased significantly. His real estate agent sent an email to Merrifield after March 18, 2008 telling them that the appraised value of the unit was only $350,000 and requested that the sales price be adjusted. (Exhibit 25B). He met with his attorney in 2008 and was told about the ILSFDA at that time.

**Julia Kim** (Unit N418) (6/29/2010, 12:41 p.m.)

Ms. Kim testified that she signed the UPA contained in Exhibit 20A (a 36-month contract to purchase Unit N418) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($31,945 and $12,778) contained in Exhibit 20A to Vantage. As shown in Exhibit 20A, Yang-Ja Kim (Ms. Kim's mother) was also a signatory to the UPA. Ms. Kim does not remember whether she was provided with a copy of the Public Offering Statement (Exhibit 31) but she identified her signature on the acknowledgement form indicating that she did receive it. She does not recall ever reading the Public Offering Statement. She also testified that she did not read the entire UPA before she signed it. In summer of 2006 she completed the Vantage Finishes Options sheet in Exhibit 20A in which she made several selections of options for the unit. From that time forward she understood that Merrifield was completing the unit based on her selections.

Ms. Kim testified that she decided not to close on the unit in late 2007 or early 2008. The real estate market had busted and she was unable to come up with the additional money to

finance the purchase. She attempted to renegotiate the sales price but was unsuccessful. She testified that she probably would have gone through with the closing if the value had not decreased. She first met with her attorney in April 2008 and at that time learned of the ILSFDA.

**Joon Yong Ahn** (Unit N407) (6/29/2010, 1:59 p.m.)

Mr. Ahn testified through an interpreter that he signed the UPA contained in Exhibit 1A (a 36-month contract to purchase Unit N407) and pursuant to that agreement he provided the two checks payable to Walker Title and Escrow ($28,045 and $11,218) contained in Exhibit 1A to Vantage. Mr. Ahn does not remember whether he was provided with a copy of the Public Offering Statement (Exhibit 31) but he did get a package of documents. He does not recall ever reading the Public Offering Statement. He also testified that he did not read the UPA word for word before he signed it. In June 2006 he completed the Vantage Finishes Options sheet in Exhibit 1A in which he made several selections of options for the unit.

Mr. Ahn testified that he decided not to close on the unit in June 2008. He first met with his attorney in June 2008 and at that time he learned of the ILSFDA. The decrease in the value of the unit was one reason he decided not to proceed to closing.

**Yoo Jin Park** (Unit N432) (6/29/2010, 2:16 p.m.)

Ms. Park testified that she signed the UPA contained in Exhibit 26A (a 24-month contract to purchase Unit N432) and pursuant to that agreement she provided the two checks payable to Walker Title and Escrow ($19,895 and $7,958) contained in Exhibit 26A to Vantage. Ms. Park acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it. In June 2006 she completed the Vantage Finishes Options sheet in Exhibit 26A in which she made

several selections of options for the unit. From that time forward she understood Merrifield was completing the unit based on the options she selected.

Ms. Park testified that she decided not to proceed to closing in mid-2007. She had purchased the unit and expected it to be completed in June 2007. Her husband was in dental school and was graduating in June 2007. Since the unit was not ready, he decided to take a job in Richmond instead of the Washington area. She met with her attorney in May 2008 and learned about the ILSFDA. Prior to that meeting she had already decided not to buy the unit. She testified that in November 2007 her real estate agent wrote a letter on her behalf indicating her desire to cancel the contract and get her deposit back because the unit was not ready.

**Jung Deok Choi** (Unit N334) (6/29/2010, 2:32 p.m.)

Ms. Choi testified through an interpreter that she signed the UPA contained in Exhibit 11A (a 24-month contract to purchase Unit N334) and pursuant to that agreement she provided the two deposit checks payable to Walker Title and Escrow ($29,245 and $8,098) contained in Exhibit 11A to Vantage. She also provided Vantage with a check in the amount of $1,000 for the options she selected in 2006. (Exhibit 11A). Ms. Choi acknowledged that she was provided with a copy of the Public Offering Statement (Exhibit 31) but that she did not read it. She also did not read the entire UPA before she signed it. On June 29, 2006 she signed the Unit Purchase Agreement Amendment #1 and completed the Vantage Finishes Options sheet in Exhibit 11A in which she made several selections of options for the unit. From that time forward she understood that Merrifield was completing the unit based on her selections.

Ms. Choi testified that since the value of the unit had decreased, she decided not to purchase the unit unless Merrifield would reduce the purchase price. She had made that decision before she first met with her attorney in 2008 and learned of the ILSFDA. Even after meeting

with her attorney and learning of the ILSFA, she still would have bought the unit if the price was reduced.

**Michael Collier** (6/29/2010, 3:05 p.m.)

In the spring of 2005 Mr. Collier was the president of Uniwest Group, the managing general partner of Merrifield Town Center Limited Partnership. He had a partner in this project who was the CEO and the two of them worked together on the project.

Sales of the units in the project began in May or June 2005 and by sometime in August 2005 they had UPAs signed by the purchaser for all the units. Mr. Collier reviewed each UPA on behalf of the seller and signed each UPA. Mr. Collier delayed signing the 24-month UPAs until August or September 2005 because there had been a delay in obtaining the site permit for the project. In June 2005 he expected to obtain the site permit shortly but they encountered some difficulties with an easement (Exhibit No. 45) that delayed issuance of the site permit until September 6, 2005 (Exhibits 46, 41). The purchasers signing UPAs were not told of any problems or delays in obtaining the site permit. The site permit was required before excavation could begin and the site permit was needed before the building permits could be issued. The building permits were issued on October 12, 2005. (Exhibit 47).

For the construction of this project a construction loan of approximately $100 million was obtained. Uniwest Construction was the general contractor with an approximate construction cost of $90 million. Mr. Collier testified that on December 31, 2006 the buildings were beyond 50% complete. He also testified that in January 2007 there was no realistic way to stop the construction of any one unit. Given the scope of the project, the structural components of each unit would need to have been completed but not the finishing. If a purchaser had told the seller in January 2007 that they would not be going to closing, the unit would still have been

constructed with the only remaining issue being what if any finishes would be done and whether the unit would be resold. Mr. Collier testified that in the summer of 2006 after a purchaser indicated the finishes they wanted; the unit was completed in accordance with those specifications.

Mr. Collier acknowledged and expanded upon several of the stipulated facts agreed to by the parties. He stated that the law firm of Walsh Colucci was retained to prepare, file and record the necessary condominium documents. Pursuant to their advice that this project was exempt from the requirements of the ILSFDA, no property report as defined in the ILSFDA was approved and no purchaser got a property report approved by HUD. Mr. Collier explained that the delays encountered with the contaminated soils, the additional groundwater and the bearing capacity of the soils (Statement of Facts nos. 20-23) came to their attention within the first six months after excavation began. Even though they had obtained soil and groundwater studies prior to beginning the project, those studies did not reveal the issues encountered once excavation began.

According to the construction schedule run on October 21, 2005, the projected finish date for the project was May 4, 2007 – within the two-year time period initially proposed. (Exhibit 40). By the time a construction schedule was run on June 9, 2006, the project completion date had slipped to December 5, 2007. (*Id.*).

Mr. Collier first considered renting units in the project in April or May 2007 when purchasers were not going to settlement. Of the 279 units in the project, only 20 purchasers actually closed on their units. Mr. Collier testified that none of those purchasers paid all cash for their units and they were able to get financing. He testified that the project is still a condominium and there were no material changes made to the exterior since 2005, there were no

changes to the residential parking and the proffered amenities such as the shuttle bus service have been provided.

**Exhibits Presented During the Evidentiary Hearing[5]**

**Plaintiffs' Contract Files**

During the evidentiary hearing the following exhibits were the subject of testimony by the plaintiffs who appeared and testified: Exhibits 1-3, 5-6, 9-12, 14-23, 25-30. Each of these exhibits contained the UPA signed by the purchaser and the seller in subpart A. Along with the UPA were Attachment #1 Standard Features; Attachment #2 Acknowledgement of Receipt of Public Offering Statement; an Indoor Environmental Information Addendum; and a Repurchase Addendum. Many of the exhibits also contained a brokerage addendum acknowledging the procuring broker/agent for the sale and a Lender Title Addendum in subpart A. Also included in subpart A were copies of the deposit checks provided by the purchasers and financing information as of the time the UPA was executed. Subpart A also included a copy of Unit Purchase Agreement Amendment #1 and the accompanying Schedule B for finishes options.[6] Subpart B contained a letter notifying the purchaser of the amount of the second deposit that was due along with the first newsletter concerning the project. Also contained in subpart B are notices of the walkthrough and settlement dates sent to the plaintiffs by Merrifield and in most cases a copy of a Notice of Default for not appearing at the noticed settlement date. For several of the plaintiffs, other communications concerning notices of cancellation or requests for price concessions are contained in subpart B. Subpart C is a copy of the March 5, 2008 letter

_____

[5] The exhibits used during the evidentiary hearing were the exhibits filed by the defendants. While plaintiffs submitted a list of exhibits (Docket no. 237) that was objected to by the defendants (Docket 246), they did not file their exhibits with the Court and they made the decision to use the defendants' exhibits during the hearing.

[6] The majority of the plaintiffs who testified indicated that they signed these documents in the summer of 2006. Some plaintiffs did not sign this amendment or complete the Schedule B selecting options for the unit.

forwarding a copy of the recorded condominium documents and certified mail receipt.[7] Subpart D is a copy of the residential use permit for the unit described in the UPA in subpart A.

During the testimony at the hearing several items in the documents contained in these exhibits were discussed. First, the UPA is an 11-page document that is signed by the purchaser on page 11 and initialed on every page. The UPA contains the unit number in paragraph 1 and indicates whether it is a 24-month or 36-month contract in paragraph 13. The only financing contingency in the UPA is contained in paragraph 4, which lasts for two weeks following the signing of the UPA by the purchaser. Most of the purchasers indicated in paragraph 6 that they intended to occupy the unit as their principal residence. Paragraph 11 states that the purchaser acknowledges receipt of the Public Offering Statement and has ten days to review it and cancel the UPA in writing without penalty and any deposit shall be returned. This paragraph also notified the purchaser that Merrifield will retain title to each unit not sold and it retains the right to lease any such unit to third parties. Each contract file has an executed Attachment #2, Acknowledgement of Receipt of Public Offering Statement noting the date and time it was signed.

### Exhibit 31 – May 24, 2005 Public Offering Statement

Exhibit 31 is the Public Offering Statement that was provided to each of the plaintiffs as acknowledged in paragraph 11 of the UPA and Attachment #2 to the UPA. On cross-examination each plaintiff testified that he or she did not read the entire Public Offering Statement either before signing the UPA or afterwards. No witness was examined about the content of the Public Offering Statement.

---

[7] Exhibit 22 only contains subparts A and B and does not have a subpart C or D.

### Exhibit 33 – Newsletters and Purchaser Memoranda

Exhibit 33 contains three newsletters from Merrifield providing some updates on the progress of the development and two memoranda sent to purchasers and agents in July and October 2007 concerning the schedule for upcoming settlements and financing options. Some of the plaintiffs testified that they received newsletters from Merrifield after signing their UPA that provided them with information on the progress of the development.

### Exhibit 34 – Assignment of Claims

During the testimony of Tia Johng (6/28/2010, 11:47 a.m.) she acknowledged executing the Assignment of Claims marked as Exhibit 34. In that assignment, Ms. Johng sold all of her rights in the claims raised in this lawsuit for a payment of half of the total amount of deposits made to Merrifield. As set forth in that Assignment, upon completion of the assignment, Ms. Johng shall have no interest in the claims raised in the lawsuit and no right to any further payment.

### Exhibit 40 – Project Construction Schedules

Exhibit 40 contains two project construction schedules including the timelines for completion of the project. The first schedule in Exhibit 40 has a run date of October 21, 2005 using data through October 5, 2005. The schedule shows that the projected finish date is May 4, 2007, the date originally anticipated by Merrifield. The second schedule with a run date of June 9, 2006 using data through June 7, 2006 showed a projected completion date of December 5, 2007.

### Exhibit 41 – Project Timeline

Exhibit 41 is a project timeline prepared by Mr. Collier. This timeline contains notations regarding the easement initially sought by Merrifield and the alternate routes for utilities to avoid

the easement issue, the discussions leading up to the issuance of the site plan, the problems encountered during excavation and the issuance of the footing and foundation permits. The timeline also notes that there was a sales preview party on May 24, 2005, that buyers were writing and executing contracts from June 4, 2005 to July 15, 2005, that some UPAs were ratified on July 5, 2005 and other UPAs were ratified from August 8, 2005 to September 15, 2005.

### Exhibit 45 – Collier letter to Clark Realty

Exhibit 45 is a letter Mr. Collier sent to Clark Realty on July 8, 2005 concerning a proposed cooperation agreement and the easement issue for the issuance of the site plan discussed by Mr. Collier.

### Exhibit 46 – Site Permit

Mr. Collier testified that Exhibit 46 is a copy of the site permit that was approved by Fairfax County on September 6, 2005.

### Exhibit 47 – Building Permits

Mr. Collier testified that Exhibit 47 contains the building permits for the north and south buildings issued on October 21, 2005.

## The Applicable Provisions of the ILSFDA

The ILSFDA provides that the sale of any lot not exempt from its provisions must comply with various disclosure and registration requirements and sales practices. In general, Section 1703(a)(1) details certain disclosure and registration requirements and Section 1703(a)(2) describes certain prohibited sales activities.[8] Section 1703(a)(1) requires that a

---

[8] The Court has found the defendants failed to comply with the disclosure and reporting provisions in Section 1703(a)(1). Plaintiffs stated that they were not pursuing any claim under Section 1703(a)(2) during a hearing on September 14, 2009. (Hr'g Sept. 14, 2009).

statement of record in accordance with Section 1706 be in effect prior to any sale and that a printed property report meeting the requirements of Section 1707 be provided to the purchaser in advance of signing a contract. Section 1703(b) provides that any non-exempt contract may be revoked at the option of the purchaser within seven days following the signing of the contract. Section 1703(b) further provides that the contract "shall clearly provide this right." Section 1703(c) provides that any contract for the sale of a lot, for which a property report is required, may be revoked at the option of the purchaser within two years of the date of the signing if the property report was not given to the purchaser in advance of the signing of the contract. Section 1703(c) also requires that the contract "shall clearly provide this right."[9]

Section 1709, titled "Civil liabilities," provides certain remedies for violations of the ILSFDA. Section 1709(a) provides that a purchaser may bring an action against a developer or agent if the sale was made in violation of Section 1703(a). Section 1709(a) provides:

> A purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable. In determining such relief the court may take into account, but not be limited to, the following factors: the contract price of the lot or leasehold; the amount the purchaser or lessee actually paid; the cost of any improvements to the lot; the fair market value of the lot or leasehold at the time relief is determined; and the fair market value of the lot or leasehold at the time such lot was purchased or leased.

Section 1709(b) provides that a purchaser may bring an action against the seller to enforce any right under Section 1703(b), (c), (d), or (e), the provisions relating to revocation. Section 1709(b) provides:

---

[9] Plaintiffs do not assert that the defendants committed a violation of Section 1703(d), so those provisions are not addressed herein. (Hr'g Sept. 14, 2009). Additionally, Section 1703(e) will not be discussed since the plaintiffs have acknowledged that the provisions of Section 1703(e) are not applicable to this case. (Hr'g Sept. 14, 2009).

> A purchaser or lessee may bring an action at law or in equity against the seller or lessor (or successor thereof) to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title.

Section 1709(c) provides that the amount recoverable in a suit under the ILSFDA may include, in addition to the matters specified in subsections (a) and (b), interest, court costs, reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot.

Section 1711, titled "Limitation of actions," provides that no action may be maintained under Section 1709 for a violation of Section 1703(a)(1) more than three years after the date of signing of the contract. Section 1711(b) provides that no action to enforce a right created under Section 1703(b), (c), (d), or (e) may be maintained unless brought within three years after the signing of the contract.

Section 1701(5) defines developer as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." Section 1701(6) defines agent as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services."

## Previous Rulings[10]

On March 16, 2009 the Court found that neither the 24-month nor the 36-month UPAs were exempt from ILSFDA's reporting and disclosure requirements and that the defendants failed to comply with ILSFDA's reporting requirements. (Docket no. 69). On July 21, 2009 the Court found that the plaintiffs are not entitled to the automatic statutory revocation remedies provided in 15 U.S.C. § 1703(b), (c) and (d) because they did not comply with those provisions'

---

[10] Only those ruling have a direct bearing on the legal issues subject to this report and recommendation are included in this section.

time requirements. (Docket no. 95). In that Order the Court found that each plaintiff will be permitted to seek the return of their deposits and rescission of the sales contracts pursuant to either § 1709(a) (for any § 1703(a) violation) or § 1709(b) (for any § 1703(b), (c) or (d) violation). (*Id.*)

On March 18, 2010 the Court issued a Memorandum Opinion (Docket no. 217) and Order (Docket no. 218) in which it dismissed the claims asserted by 82 of the plaintiffs for failure to comply with discovery obligations in face of orders to do so. In that Memorandum Opinion the Court provided the parties with a clear roadmap of what each party must establish to prevail on their remaining claims or defenses. The Court stated that in order to prove entitlement to rescission of the UPAs, plaintiffs must prove: (i) that ILSFDA violations occurred, (ii) that these violations were material or, in other words, that they would have influenced a reasonable purchaser's decision to enter into the contract for sale, and (iii) either that rescission would restore the parties to the *status quo ante*, or that the equities of the situation demand rescission. The Court stated that pursuant to the application of principals of federal common law, a plaintiff is not required to show actual prejudice to obtain rescission under the ILSFDA and that rescission is available only if plaintiffs can prove objective materiality.

> And in this regard, misstatements or omissions are material when they "would have influenced the decision" to enter into the disputed contract with the omitting or misrepresenting party. *Shipley*, 333 F.3d at 905 (citing cases); *see also Grymes v. Sanders*, 93 U.S. 55, 60 (1876) (holding, for rescission of contract for sale of land, that mistake "must be such that it animated and controlled the conduct of the party"). This standard is an objective one; in other words, rescission is appropriate only where an omission "would be likely to affect the conduct of a reasonable man" with respect to the specific contract in issue. Restatement (First) of Contracts § 470 (1932); *see also McCormick & Co. v. Childers*, 468 F.2d 757, 765-66 (4th Cir. 1972) (citing Restatement (First) of Restitution § 28 (1937); Williston on Contracts § 1500 (3d ed.); 3 Pomeroy's Equity Jurisprudence § 891 (5th ed. 1941)).

As to the defendants' affirmative defenses, the Court was equally specific. For the defense of laches defendants must prove (i) that each plaintiff inexplicably or inexcusably delayed in seeking revocation of the UPAs once he or she became aware of the ILSFDA violations, and (ii) that defendants have been prejudiced in a manner that would not have occurred but for each plaintiff's delay. For the equitable estoppel defense defendants must prove (i) that each plaintiff represented that he or she intended to perform on the UPAs despite knowing of the ILSFDA violations, (ii) that defendants changed position in reliance on that representation, and (iii) that defendants' reliance was reasonable. To establish an unclean hands defense the defendants would need to show that a plaintiff engaged in inequitable conduct with respect to the UPAs. The Court found that the defendants could not assert either a first material breach defense or a condition precedent defense in this ILSFDA action.

## Recommendations

Even though the Court provided the parties with a clear roadmap of what evidence needed to be produced during the evidentiary hearing to prevail on their claims or defenses, the two days of testimony had little bearing on those items. The proposed findings of fact and conclusions of law submitted on July 20, 2010 (Docket nos. 253, 254) did, to some extent, address the issues in more detail, but those arguments must be considered in light of the actual evidence that was presented during the evidentiary hearing.

The only claim remaining as to these plaintiffs is Count One in the second amended complaint filed on January 12, 2009 (Docket no. 47) asserting a violation of the ILSFDA. As stated by the Court in its Order of referral, the first consideration is whether there as been a violation of the ILSFDA. The Court previously found that plaintiffs' second amended complaint satisfied the notice requirements of Federal Rule of Civil Procedure 8 as to claims under § 1703

(a), (b) and (c). (Docket no. 217). Whether the plaintiffs have established a violation of each of those sections will be discussed separately below.

**Was there a violation of the ILSFDA?**

### Section 1703(a)

In ruling on the motion for partial summary judgment this Court found (and the plaintiffs introduced evidence during the evidentiary hearing to support a finding) that no statement of record was in effect in accordance with section 1706 at the time of the sale of the units in violation of § 1703(a)(1)(A) and a printed property report, meeting the requirements of section 1707, was not furnished to the purchaser in advance of the signing of the UPA in violation of § 1703(a)(1)(B). (Docket no. 217). Under these circumstances there is no question that the plaintiffs have established a violation of § 1703(a)(1)(A) and (B).[11]

Plaintiffs' proposed findings of fact and conclusions of law include a section in which they propose certain findings and conclusions relating to a violation of the misleading sales practices provisions in § 1703(a)(2).[12] However, plaintiffs did not introduce any evidence (either by testimony or exhibits) during the hearing relating to any advertising or promotional material with respect to the sale or lease of the units. Plaintiffs did submit an exhibit list on May 14, 2010 in which they listed as an exhibit a Vantage Brochure (Docket no. 237, Ex. no. 20). However, plaintiffs did not file any exhibits with the Court either prior to the evidentiary hearing or during the evidentiary hearing but instead made the decision to rely on the exhibits the defendants had

---

[11] Plaintiffs have made no argument and did not present any evidence to support a finding of a violation of § 1703(a)(1)(C) or (D). Since no statement of record or property report was provided, there can be no violation of § 1703(a)(1)(C). No evidence was presented during the evidentiary hearing concerning advertising or promotional material displayed or delivered to prospective purchasers that could support a violation of § 1703(a)(1)(D).

[12] See plaintiffs' proposed findings of fact and conclusions, Docket no. 254, pg. 21-23. It appears that the citation contained in paragraph 15 is incorrect and should be § 1703(a)(2)(B) and not § 1704(a)(1)(B)(2).

offered. Plaintiffs' belated attempt to attach this exhibit to their proposed findings of fact and conclusions of law long after the evidentiary hearing had been concluded is not proper.[13] Since there was no evidence presented at the evidentiary hearing concerning any promotional material provided to the plaintiffs prior to the sale of the units, there can be no finding of a violation of § 1703(a)(2) as to those materials.

Plaintiffs also claim in their proposed conclusions that several of the plaintiffs were mailed drafts of unfiled state court law suits which included a claim of fraud and a prayer for an award of punitive damages citing Exhibits 3B, 4B, 5B and 15B.[14] Plaintiffs then refer to testimony allegedly given by Mr. Collier on August 18, 2009 to support a finding that the defendants had no facts to support their allegations of fraud or misconduct. That testimony was never presented during the evidentiary hearing and therefore cannot be considered in this report and recommendation.

The final assertion made by the plaintiffs concerning § 1703(a)(2) is that the defendants "misled the plaintiffs by calling them in to sign an option sheet and having them sign an addendum extending the delivery date, with the extension buried in with the options and couched in vague language." (Docket no. 254, p. 23 ¶ 27). As shown in subpart A of the exhibits relating to UPAs, in the summer of 2006 the plaintiffs were provided with a Unit Purchase Agreement Amendment #1 and a Vantage Finishes Options – Schedule "B – 2A". (*see e.g.* Exhibit 1A, MER 05542-43). During the evidentiary hearing most of the plaintiffs, but not all, testified that they signed the UPA Amendment and completed the schedule selecting options. Most of the

---

[13] Plaintiffs' reliance on the language of the standard scheduling order and local rules to support consideration of this exhibit is unavailing. Given the unusual nature of this case, no standard scheduling order was entered by the Court (*see* Docket no. 95 setting discovery schedule) and Local Civil Rule 79(A) clearly requires a party intending to offer exhibits to file them with the Clerk one business day before trial.

[14] For reasons that will be discussed more below, Exhibit 4B was not introduced into evidence during the evidentiary hearing since Yang Ja Bae failed to appear at trial.

plaintiffs who signed these forms understood that Merrifield would be completing their units with the finishing options they selected. In some instances the purchasers selected upgraded options and provided Merrifield with a deposit of half of the cost of those upgrades. Some plaintiffs did not complete these forms and relied on Merrifield to select the options based on the most popular standard finishes at no additional costs as set forth in Merrifield's May 23, 2006 letter. (*see*, Exhibit 2B, MER06343). Plaintiffs argue that the provision in the amendment that provides that the "Agreement Ratification Date, as defined in the Agreement, is hereby amended to be the date of the execution by both parties of this Amendment" was misleading because the extension was "buried in with the options and couched in vague language." Although the language purporting to amend the Agreement Ratification Date is not highlighted in the UPA Amendment, it is not "buried" in that one page amendment. It is set apart from the other provisions in the amendment and its language is clear – the Agreement Ratification Date is being amended to be the execution of the amendment. There is nothing misleading or vague about this provision and, as shown by the testimony of the plaintiffs, a purchaser was not required to sign the amendment. For these reasons it is recommended that the Court find the plaintiffs have not established a violation of § 1703(a)(2).

### Section 1703(b)

The Court previously noted that plaintiffs alleged a potential claim under § 1703(b). This section provides that a purchaser may revoke the contract within seven days following the signing of the contract "or until such later time as may be required pursuant to applicable State laws, and such contract or agreement shall clearly provide this right." The UPA clearly provides in paragraph 11 that under Virginia law the purchaser has ten (10) days to review the Public Offering Statement and has the right to cancel the Agreement during that ten (10) day period

42

without penalty and any deposit made shall be promptly refunded in its entirety. The Public Offering Statement that was provided to each plaintiff also states on the first page that under Virginia law the purchaser has ten days from the contract date or the date of delivery of the Public Offering Statement to cancel the contract and obtain full refund of any sums deposited in connection with the contract. (Exhibit 31). Given these clear notices, plaintiffs have not pursued a claim under this section of the ILSFDA.

### Section 1703(c)

Section 1703(c) provides that if a property report has not been provided as required under the ILSFDA, a purchaser has the right to revoke a contract within two years from the date of such signing **and such contract or agreement shall clearly provide this right.** (emphasis added). A review of the UPAs signed by the plaintiffs in this action reveals that there is no notice that clearly provides that right. Defendants do not contest that such a provision is contained in the UPA, believing at the time that they were not required to comply with the provisions of the ILSFDA. For this reason, it is recommended that there be a finding of a violation of the portion of § 1703(c) requiring that purchasers be notified of their right to revoke the contract within two years if a property report was not provided.

### Were the violations of the ILSFDA material?

Having addressed the Court's initial question as to what ISLFDA violations occurred, the next issue is whether those violations were material, or in other words, would they have influenced a reasonable purchaser's decision to enter into the contract for sale. Plaintiffs argue that since there were no disclosures made pursuant to §§ 1703(a)(1)(A) or (B) or 1703(c) then the Court must find that the violations were material since Congress and the Office of Housing and Urban Development have decided that buyers should receive that information before making

a decision to purchase. Defendants argue that the UPAs and the Public Offering Statements that were given to the plaintiffs substantially provided the plaintiffs with the information that was required by the ILSFDA.[15] Defendants assert that no plaintiff was able to identify any ILSFDA required information that was not disclosed in the contract documents.

Plaintiffs spend much of their proposed conclusions section arguing that the Court should not take into consideration any other forms of disclosures given by the defendants in making a determination on materiality. In support of that argument they quote at length the decision in *Burns v. Duplin Land Development, Inc.*, 621 F. Supp. 2d 292 (E.D. N.C. 2009) for the proposition that any information required to be disclosed in the ILSFDA is material and relevant and one may not "substantially comply" with the ILSFDA by furnishing the required information by alternative means. In that case the evidence was clear that the property report provided to the plaintiffs did not state that the subject lot was in a flood plain. The evidence was equally clear that the plaintiffs were told and knew that their lot was in a flood plain before they signed their contract. The court found that reliance on the omitted information was not required under the ILSFDA; there is no "ignorance requirement" that the purchaser lack actual knowledge of the omitted fact in the ILSFDA; there is no scienter requirement that the seller acted with the intent to defraud or deceive; there can be no "substantial compliance" through oral statements; and one must look to the fact that was omitted in making the materiality determination and not whether the omission was material. The court found that the fact that a lot was in a flood plain was a material fact and should have been disclosed.

---

[15] While the defendants criticize the plaintiffs for not following the Court's "roadmap", they focused much of their questioning of the plaintiffs on whether they read the UPAs or the Public Offering Statements. While it is understandable that one may want to argue that these plaintiffs did not even read the UPAs they signed or the Public Offering Statements they were provided so what difference would it have made if they were given an ISLFDA property report or another notice in the UPA, the Court has rejected these Virginia law requirements for rescission and has found that under federal common law this must be decided based on an "objective" standard.

While plaintiffs rely heavily on this case, they fail to discuss the context in which those decisions were made. Much like the claims here, in *Dublin* the court had before it a motion for summary judgment for a finding of "liability" under the ILSFDA. The court found there was liability under the ILSFDA (much like this Court's ruling that there was a violation) but stated that a later status conference would be held to discuss the issue of remedy. *Dublin*, like this case, involved an action that was filed more than two years and less than three years after the contract was signed. Therefore the issue of whether the plaintiffs in that case would have been entitled to an equitable remedy of rescission for the violation of not including the flood plain disclosure in the property report even though the plaintiffs were told that information and were aware that the lot was in a flood plain prior to signing the contract was never addressed.[16]

In the Court's March 18, 2010 Memorandum Opinion this matter was referred for an evidentiary hearing on the issue of whether the plaintiffs can prove "objective materiality". While there is no specific discussion of the issue of whether this determination should take into account the disclosures that were provided to the plaintiffs by the defendants, it is clear that there would be no need for a referral or an evidentiary hearing on this issue unless that information should be considered. Otherwise, in any case in which a property report was not provided as required by the ILSFDA there would be no question as to a material violation since it would be assumed that no information whatsoever was provided to the purchaser. Accordingly, this issue will be framed as whether a reasonable purchaser who had the UPA and Public Offering Statement in the summer of 2005 would have been influenced in making a decision to enter into the contract if he or she had been provided with any additional information required to be disclosed or provided under the ILSFDA.

---

[16] According to the docket sheet in that case, a stipulation of dismissal under Rule 41(a)(1) was filed on November 18, 2009 and a Judgment was entered dismissing the case with prejudice was entered on November 19, 2009.

Both parties have attached as exhibits to their proposed findings of fact and conclusions of law a comparison of what information they contend was required to be disclosed pursuant to the ILSFDA and the information that was contained in the UPA and Public Offering Statement. The defendants' comparison contains a chart listing the 12 items in § 1705 that shall be contained in a statement of record and references to the page numbers of the Public Offering Statement in which they contend that information was disclosed. Plaintiffs' comparison focuses on the information that is set forth in the regulations adopted by the Office of Housing and Urban Development pursuant to the ILSFDA. *See* 24 C.F.R. § 1710.100 *et seq.* Since it is plaintiffs' burden to establish this claim, the items they have presented in their proposed findings and conclusions will be addressed in detail.

Plaintiffs list 14 items that they contend are required in the property statement disclosures that are not in the Public Offering Statement. A review of the Public Offering Statement and the UPA reveals that there was no purchase cancellation form for the purchaser to cancel the contract (24 C.F.R. § 1710.118); there was no disclosure of the risks of buying land (24 C.F.R. § 1710.107); there was no disclosure of the average temperature ranges, summer and winter, for the area or the average annual rainfall and snowfall (24 C.F.R. § 1710.115(h)); and there was no disclosure that the area has a moderate risk of hurricanes (24 C.F.R. § 1710.115(g)(2)).[17]

Plaintiffs claim they should have been provided a list of required state and local permits and whether those permits had been obtained. (24 C.F.R. § 1710.209(a)(4)). However, that requirement relates to the statement of record filed with HUD, not the property report provided

---

[17] This section of the CFR (plaintiffs incorrectly cite to 24 C.F.R. § 1710.109(g)(2) concerning zoning requirements) provides "[i]s the area subject to natural hazards or has it been formally identified by any Federal, State or local agency as an area subject to the frequent occurrence of natural disasters (*e.g.*, tornadoes, hurricanes, earthquakes, mudslides, forest fires, brush fires, avalanches, flash flooding, *etc.*)?". For the purposes of this discussion, it is assumed that a moderate risk would satisfy the "frequent occurrence" requirement. There is no mention of warnings concerning the risks of severe thunderstorms or winter storms in this section.

to the purchaser. Section 1710.200 provides that the **statement of record** shall contain the statements and documents required in §§ 1710.208 through 1710.219. Section 1709(g)(4) discusses the requirements for permit disclosures in the **property report** and provides that if a purchaser must obtain a building permit before beginning construction, a disclosure be made as to where the permit is to be obtained and whether there are any other permits necessary to use the lot for the purpose for which it is sold. The Public Offering Statement did state that a site plan was applied for on March 16, 2004 and that the property is subject to all conditions contained in the site plan and proffers (the proffers where included in the Public Offering Statement). (Exhibit 31, MER 10740). The Public Offering Statement also stated that the building plans with an application for building permits are expected to be filed in 2005. (*Id.*). The proffers also describe various approvals and agencies involved in the oversight of the project. (*Id.*, MER 10939-61).

Plaintiffs cite 24 C.F.R. § 1710.109(g)(1) for a requirement that environmental conditions affecting the lots must be disclosed. That section of the CRF refers to plats being approved by regulatory authorities, not environmental conditions. Section 1710.109(g)(5) labeled "Environment" does provide that if an environmental impact study has been prepared that a summary of any adverse conclusions be provided and the purchaser be referred to the study for additional information. It also provides that if a study has not been prepared, then a statement should be included that no determination has been made as to the possible adverse effects the subdivision may have upon the environment and surrounding area. While the UPA does contain an Indoor Environmental Information Addendum (*e.g.* Exhibit 1, MER 05528-9) and a notice/disclaimer in paragraph 29(h) of the UPA, there does not appear to be any disclosures or discussion concerning an environmental impact study. The proffers submitted to Fairfax County

contained in the Public Offering Statement do refer to several environmental issues. (Exhibit 31, MER 10946-51). However, no evidence was presented during the evidentiary hearing as to whether an environmental study was done and if so if there were any adverse conclusions contained in that study that should have been disclosed but were not disclosed. Without that evidence, a determination of materiality cannot be made.

As to the claim the no disclosures were made concerning easements affecting the lots (24 C.F.R. § 1710.109(f)(1)), a review of the Public Offering Statement reveals that the easements and restrictive covenants concerning the units were disclosed and explained in several places. *See e.g.* Exhibit 31, MER 10730-33; 10755-59; 10773-4; 10827-29; 10938-61; 10965-66. In addition, each plaintiff signed the UPA which provided a restriction on their right to resell the unit within the first twelve months. (UPA ¶ 37, Repurchase Addendum). No evidence was presented at the evidentiary hearing that any easements or restrictive covenants exist on the units other than those disclosed in the Public Offering Statement and UPA.

Plaintiffs also contend that there was no disclosure of unstable soil conditions, any fill used on the site or any nuisances which may adversely affect the subdivision. (24 C.F.R. § 1710.115(a), (c), (f)). A review of those provisions reveals that the purpose of the disclosures as to any unstable soils and fill needed for the site is to notify the buyer of the lot of those conditions and what affect they may have on the type and cost of construction by the purchaser and who will be responsible for any corrective action. In this case, the plaintiffs are not buying an undeveloped plot of land on which they would be building a home. The plaintiffs in this case were purchasing one of 279 condominiums in a to-be-built, two building, multi-story project. As to the disclosure of any nuisances, the UPA warns the purchaser of inconveniences that may occur until all the units are sold (¶ 12), issues arising from living in a multifamily property and

48

noises from the nearby commercial and retail businesses and restaurants, bars and/or entertainment venues, and other building, street and neighborhood noises (¶ 23). The Public Offering Statement also mentions possible audible noises and odors (Exhibit 31, MER 10712-3, 10718-9, 10721-22) and discloses that the project is near two Interstate highways with a retail shopping center to the south, a movie theater to the west and more retail shops to the north, all in a mixture of commercial zoning districts (*Id.*, MER 10735). No evidence was introduced during the evidentiary hearing that other nuisances exist that were not disclosed.

Plaintiffs also list as a deficiency the requirement that there be a disclosure if the Developer had a deficit in retained earnings or experienced an operating loss during the last fiscal year or, if less than a year old, since its formation (24 C.F.R. § 1710.112). The first part of this section provides that the information only needs to be provided if the answer to the question is an affirmative one. No evidence was introduced at the evidentiary hearing that the Developer had a deficit in its retained earnings or experienced an operating loss that would have necessitated a disclosure under this section. Without that evidence there can be no finding of materiality on this issue.

As to plaintiffs' claim under § 1710.113 that the required local services were not disclosed, the Public Offering Statement does include a general disclosure of some local services in the area (Exhibit 31, MER 10735) but it does not explicitly state that fire and police protection are available; that elementary, junior high and senior high schools are available to residents; the location of the nearest hospital, physicians' and dentists' offices; whether ambulance services are available; and the availability of mail service and public transportation. The proffers that are included in the Public Offering Statement do identify an elementary, a middle and a high school that are the beneficiaries of certain sums to be donated by the applicant. (Exhibit 31, MER

10942). The proffers also discuss the transportation management strategies to be implemented, including providing a shuttle bus service to the Dunn Loring Metro Station.

While the Public Offering Statement does not appear to state that the developer is in compliance with title VIII of the Civil Rights Act of 1968 by not discriminating on the basis of race, religion, sex or national origin (24 C.F.R. § 1710.116(f)), it does state that the marketing and sale of the units will be conducted in accordance with the Virginia Fair Housing Law and the Virginia Condominium Act which prohibit discrimination because of race, color, religion, national origin, sex, elderliness, familial status or handicap. *See* Va. Code §§ 36-96.3-.4 and 55-79.52(c). (Exhibit 31, MER 10712, 10728).

Section 1710.117 provides that a cost sheet is to be provided listing major costs relating to the purchase. This section also provides that a senior executive officer or a duly authorized agent sign the property report indicating it is an accurate description of the subdivision and development plans. There does not appear to be a cost sheet similar to the one set forth in 24 C.F.R. § 1710.117 contained in the Public Offering Statement. However, there is a description of the major costs contained in the UPA and Public Offering Statement. The base price of the unit, the cost of any parking space and storage space are listed in paragraph 2 of the UPA. Any closing cost credit is contained in paragraph 3 of the UPA. The Public Offering Statement explains that real property taxes are levied separately as to each unit with the 2005 tax rate of $1.00 per hundred dollars of assessed value. (Exhibit 31, MER 10712, 10739). The Public Offering Statement also describes in various places the assessments that will be imposed and any other settlement costs and expenses (Exhibit 31, MER 10726, 10728-9, 10735-39, 10811-21, 10837-39, 10860-67, 10872-904). Plaintiffs have not identified any specific major cost item that was not described in either the UPA or the Public Offering Statement. Since no property report

was given to the plaintiffs, it is obvious that a senior executive officer did not sign the property report. Mr. Collier, a senior executive officer, did sign the UPAs which specifically refers to the Public Offering Statement. (UPA ¶ 11).

Given the evidence that was presented at the evidentiary hearing the materiality question becomes whether a reasonable purchaser of a condominium unit in this development in the summer of 2005 would have been influenced by: (1) having a form that could be used to cancel the contract instead of being given notice of the right to cancel and the address that the notice should be sent[18]; (2) being told there were risks in buying land such as the future value of land is uncertain and not to expect all land value to increase, that the value may depend on all improvements being completed, that the resale may be difficult or impossible because of competition by the seller or lack of interest by real estate brokers; (3) being told the average temperatures, rainfall and snowfall in the area; (4) being told there is a moderate risk of hurricanes: (5) being told that fire and police protection are available; that elementary, junior high and senior high schools are available to residents; that hospitals, physicians' and dentists' offices are nearby; that ambulance services are available; that mail service is available; and that public transportation is available; (6) being told that in addition to not discriminating under Virginia law, there is no discrimination on the basis of race, religion, sex or national origin under title VIII of the Civil Rights Act of 1968; and (7) being given a single sheet listing the major costs. Given the nature of this development – a to-be-built, multifamily, multistory condominium, with prices ranging from $380,000 to $900,000 in the heart of Fairfax County, Virginia – the undersigned recommends a finding that those additional disclosures would not have influenced a reasonable buyer.

---

[18] Paragraph 11(b) of the UPA explains the ten day right to cancel and provides the address the notice is to be delivered. The Public Offering Statement also explains this right to cancel and contains the declarant's address. (Exhibit 31, MER 10708, 10741).

In reviewing the deficiencies in the information listed in the regulations, the overall purpose of the ILSFDA should be considered. As the Court of Appeals for the Fourth Circuit recently stated:

> ILFDA is a remedial statute enacted to prevent interstate land fraud and to protect unsuspecting and ill-informed investors from buying undesirable land. *See Kemp v. Peterson*, 940 F.2d 110, 112 (4th Cir. 1991) ("The Act is designed to prevent fraud and deception in the sale of undeveloped land"); *Ahn v. Merrifield Center Ltd. P'ship*, 584 F. Supp. 2d 848, 853 (E.D. Va. 2008). To this end, the statute requires that specified disclosures be made prior to a purchaser's execution of a sales contract. *See Ahn*, 584 F. Supp. 2d at 853. *See generally* Conf. Rep. 90-1785 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 3053, 3066 (describing purposes of disclosure requirements as preventing material misrepresentations by sellers). These disclosure requirements are designed to protect purchasers by ensuring that "'prior to purchasing certain types of real estate, a buyer [is] apprised of the information needed to insure an informed decision.'" *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (quoting Cost *Control Mktg. & Mgmt., Inc. v. Pierce*, 848 F.2d 47, 48 (3d Cir. 1988)).

*Long v. Merrifield Town Center Ltd. P'ship*, 611 F.3d 240 (4th Cir. 2010). In this case we are not concerned with a developer attempting to sell a parcel of undeveloped land in Florida to investors throughout the country. Here, we are concerned with a purchaser of a condominium unit in multistory building to be constructed in the heart of Fairfax County, Virginia in which most of the purchasers have represented that the unit is for their principal residence.[19] The regulations that were enacted pursuant to the ILSFDA cover a broad spectrum of possible sales activities and must be construed in light of the overall purpose of the ILSFDA – to ensure that prior to purchasing certain types of real estate a buyer is provided with the information needed to insure an informed decision as to that purchase. What information is needed by a buyer to make an informed decision will vary depending on the type of real estate and location.

---

[19] Only four of the 25 UPAs admitted into evidence have indicated in paragraph 6 that the purchaser will not occupy the residence as his or her principal residence. (Exhibits 10A, 14A, 21A and 22A).

Any reasonable buyer of a unit in this planned development would not have been influenced in making a decision to enter into the UPA based on being provided with a form stating that he or she had a right to cancel the agreement within seven or ten days since that same information was provided in the UPA and the Public Offering Statement. A reasonable buyer of a condominium unit in this proposed high-end development would also be aware that there is a risk that the unit may not increase in value, that the value depended on the project being completed, that the developer was selling units in the project and that it might be difficult to resell the unit once the buyer had the right to resell the unit.[20] A reasonable buyer of a condominium in Fairfax County, Virginia would also be aware of the general climate conditions in the area and that there is a risk of hurricanes in this area. Given that the climate conditions in this area are not extreme and the risk of any damage to a unit from a hurricane in a multistory building in the heart of Fairfax County is remote, the failure to provide this information would not be material to a potential buyer. There would be no need to inform a reasonable buyer of a unit in this development that fire and police protection are available; that elementary, junior high and senior high schools are available to residents; that hospitals, physicians' and dentists' offices are nearby; that ambulance services are available; that mail service is available; and that public transportation is available. Given that the certification concerning non-discrimination under Virginia law is the same in substance as non-discrimination under title VIII of the Civil Rights Act, this missing certification would not influence a reasonable purchaser. Finally, the major costs relating to the purchase of a unit were disclosed fully in the UPA and the Public Offering Statement and the failure to provide a "cost sheet" would not be a material omission under the ILSFDA since the relevant information was provided to the potential buyer.

---

[20] Each of the UPAs included a restriction on the right to sell the unit for twelve months from the closing date.

## Would rescission restore the parties to the *status quo ante?*

While the evidence presented on this issue was limited, it does appear that rescission would restore the parties to the *status quo ante*. The only argument presented by the defendants to support a finding that rescission would not restore the parties to the *status quo ante* is that rescission is an extraordinary remedy and that the plaintiffs allowed the defendants to complete the units as ordered when they knew they were not going to settle on the units. In general the evidence presented by the defendants was that in the summer of 2006 most of the plaintiffs completed a schedule indicating the finishes that they wanted in their units based on various options provided by the defendants. For those who did not select any finishing options, the defendants would select finishes based on the most popular standard finishing options. Plaintiffs' cross examination of Mr. Collier revealed that once the project was underway, there was no real choice but to construct the entire building. The only alternative they had once the construction was underway was whether to complete the interior finishing work on any particular unit. There was no evidence presented to support a finding that any of the plaintiffs completed the finishes schedule in the summer of 2006 knowing at that time that they would not be closing on the unit. The decisions not to proceed to closing were – for the most part – made in late 2007 or 2008 when the plaintiffs were being called to closing. At that point, there was little the defendants could do to mitigate the impact of those decisions in completing the project. Under the circumstances in this case, if the plaintiffs prevail on the materiality factor above, they should be entitled to rescission and the return of their deposits.

## Should the claims of the plaintiffs who failed to appear be considered?

In the event the Court finds that plaintiffs have shown that a reasonable purchaser would have been influenced by the disclosures not provided in the UPA and Public Offering Statement,

the issue of which plaintiffs are entitled to recover must be addressed. The first issue is whether there can be any recovery for six of the remaining plaintiffs who failed to appear at the evidentiary hearing and for whom no testimony was presented concerning the purchase of their units: Yang Ja Bae (Unit S326); Rahul Chaudhry (S513); Raj Chaudhry (S508); Dustin Han and Ae Ju Lee (Unit S203); and Chris Padden (S308). Plaintiffs' witness list identified all of the plaintiffs as trial witnesses (Docket no. 238) and during the status conference held on June 25, 2010 (the Friday before the evidentiary hearing), counsel for the plaintiffs indicated that all the remaining plaintiffs would be appearing to testify. Since no one appeared to identify the UPAs relating to those transactions and submit to questioning by the defendants, the defendants withdrew their proposed exhibits 4, 7, 8, 13 and 24. Plaintiffs never filed any exhibits with the Court so those plaintiffs' exhibits were not a part of the evidence presented during the evidentiary hearing. Plaintiffs argue in their proposed findings that they are entitled to have their claims considered even though they did not appear because "a party to a case is not required to be present at a hearing unless required to be present by notice or subpoena" citing 28 U.S.C. § 1654. A review of the provision cited by the plaintiffs reveals it concerns a party's right to act as their own counsel and not whether a plaintiff has to appear at his or her trial. Accordingly, the undersigned recommends a finding that Yang Ja Bae; Rahul Chaudhry; Raj Chaudhry; Dustin Han and Ae Ju Lee; and Chris Padden have failed to produce any evidence to support their claims and their claims should be dismissed.

The next issue relates to the testimony of Han H. Kim and Unit N325. Mr. Kim appeared and testified that his daughter, Sinthia Kim, signed the UPA and presented the deposit checks contained in Exhibit 17(A). He was present in Merrifield's sales office when his daughter signed the UPA and, while it is unclear if he actually witnessed the signing of the UPA, he did identify

her signature. However, a review of Exhibit 17(A) reveals that on June 27, 2006 a General Addendum No. 1 was signed adding Han Ho Kim to the contract. (Exhibit 17A, MER 04665). Given that Mr. Kim was added as a purchaser to this UPA, the undersigned recommends that the defendants' request to strike the evidence relating to that UPA and unit be denied.

The final issue as to whether a proper plaintiff appeared at the evidentiary hearing relates to the testimony of Tia Young Johng and Unit S313. Ms. Johng admitted during her testimony that she assigned all of her rights in the claims presented in this lawsuit as shown by the assignment of claims introduced by the defendants. (Exhibit 34). Plaintiffs do not address this issue in their proposed findings submitted to the Court. Given that the assignment states that the assignor (Ms. Johng) has no interest in the claims in this lawsuit and she has no right to any further payment with respect to those claims, her claim should be dismissed.

### Should all the defendants be held liable for any ILSFDA violation?

In the event the Court finds that plaintiffs have shown that a reasonable purchaser would have been influenced by the disclosures not provided in the UPA and Public Offering Statement, the issue of which defendants should be held accountable must also be determined. Other than a few brief questions to Mr. Collier confirming that he was the president of Uniwest Group, the managing general partner of Merrifield Town Center Limited Partnership, no additional testimony was presented at the evidentiary hearing. The stipulation of facts and the exhibits that were admitted are the only other evidence in the record concerning these issues.[21]

There can be no question that Merrifield is a proper defendant as well as Uniwest Group, LLC, the sole general partner of Merrifield, and Mr. Collier the president Uniwest Group. Each of the UPAs was signed by Mr. Collier, for Merrifield by Uniwest Group LLC, its general

---

[21] Once again, in plaintiffs' proposed findings of fact and conclusions they refer to a deposition of Mr. Collier taken on August 18, 2009 that is not part of the evidentiary record.

partner. As shown in the various plaintiffs' contract files, Uniwest Development sent correspondence to the plaintiffs providing them with copies of the recorded condominium documents in March 2008 (subpart C) and sent default notices to the plaintiffs when they failed to appear at closing (subpart B). As such it appears the Uniwest Development, LLC was either engaged in the selling effort or acting as an agent for the seller and pursuant to 15 U.S.C. §§ 1701 (5) and (6) and 1703 should be responsible for any judgment entered in favor of the plaintiffs.[22]

## Did the defendants establish any of their affirmative defenses?

### Laches

The Court has stated that in order for the defendants to prevail on their defense of laches the must prove (i) that each plaintiff inexplicably or inexcusably delayed in seeking revocation of the UPAs once he or she became aware of the ILSFDA violations, and (ii) that defendants have been prejudiced in a manner that would not have occurred but for each plaintiff's delay. The defendants' defense of laches fails on the first element. The evidence presented through the testimony of the plaintiffs who appeared at the evidentiary hearing was consistent. Each of them testified that they were not aware of the ILSFDA until they met with an attorney. Most of the plaintiffs testified that it was Mr. Fitzgerald who first informed them of the ILSFDA in the spring of 2008. A few plaintiffs testified that they met with another attorney prior to meeting with Mr. Fitzgerald but they were not told of the ILSFDA until meeting with Mr. Fitzgerald. The initial complaint in this case was filed in April 2008 and was styled a class action. Other plaintiffs were added over the next several months. While defendants did introduce evidence that several of the plaintiffs had decided not to go to closing long before meeting with Mr.

---

[22] Defendants do not make any argument in their proposed finding of fact or conclusions that one or more of the defendants should not be held accountable if an ISLFDA violation is established.

Fitzgerald and long before informing Merrifield of their intentions not to close, there was no evidence presented to support a finding that any plaintiff inexplicably or inexcusably delayed in seeking revocation of the UPAs **once he or she became aware of the ILSFDA violations.**

### Equitable Estoppel

As to the defense of equitable estoppel the Court has instructed that the defendants must prove (i) that each plaintiff represented that he or she intended to perform on the UPAs despite knowing of the ILSFDA violations, (ii) that defendants changed position in reliance on that representation, and (iii) that defendants' reliance was reasonable. Again, defendants have failed to present sufficient evidence to support the first element of this defense. There was no testimony or evidence presented that any plaintiff represented that he or she intended to perform on his or her UPA despite knowing of the ILSFDA violations. The only evidence the defendants presented was that most plaintiffs signed the UPA Amendment #1 and completed the Finishes Options schedule in the summer of 2006 and the Merrifield then constructed the units based on those selections. There was no evidence that any plaintiff knew of the ILSFDA at the time they signed the UPA Amendment and completed the Finishes Options schedule. Since there was no evidence of any representations being made to Merrifield by the plaintiffs **despite knowing of the ILSFDA violations,** the defendants have failed to establish this affirmative defense.[23]

### Unclean Hands

The final affirmative defense remaining for the defendants is unclean hands. Plaintiffs are not entitled to rescission if they have engaged in inequitable conduct with respect to the

---

[23] Defendants did have many of the plaintiffs admit that despite knowing of the ILSFDA violations, they may have closed on the unit if the value of the unit had not decreased and they were able to get financing. Defendants also established that several of the plaintiffs were licensed realtors at the time they signed the UPAs. However, there was no evidence presented that any plaintiff told Merrifield he or she would close after knowing of the ILSFDA violations or that the licensed realtors knew about the ILSFDA violations before meeting with an attorney.

UPAs. The only basis for a claim of inequitable conduct by the plaintiffs in this case is that several of the plaintiffs delayed in telling Merrifield that they did not intend to close on their units until they were called to closing or after they were sent a default letter. While the defendants are correct in arguing that the testimony of the plaintiffs clearly revealed that the decisions not to proceed to closing had nothing to do with the alleged violations of the ILSFDA, this does not amount to inequitable conduct. Several of the plaintiffs who signed the 24-month UPAs believed that once the projected delivery date had passed and the units were not ready, that they would not need to close on their units. A few of the plaintiffs testified that when they received the recorded condominium documents in March 2008 they attempted to cancel their contracts because they noticed some changes in the documents. Several of the plaintiffs testified that they tried but were unable to obtain financing to close on the units either because of the lower appraisal value for the units (significantly lower than the purchase price) or because their personal financial conditions had worsened since signing the UPAs. Under these circumstances it is clear that the defendants have not established their burden on the unclean hands defense.

### Conclusion

For the reasons stated above about, the undersigned recommends the following findings:

1. Plaintiffs Joon Ahn, Ahlam Abdel Aldin, Kyong Ashby, Maria Bras, Michael Huang & Lai Chan, Annie & Jung Cho, Seung Cho, Jung Choi, Lydia Cotto, Mahbod Hashemzadeh, Eunjoo Kim, Han Ho & Sinthia Kim, Heeyon Kim, Jennifer Kim & Cynthia Moh, Yang & Julia Kim, Kwan Kim, Chang Kim, Jin & Oriole O'Neill, Hoon Park, Yoo Park, Zhou Plant, Malini Raswant, Young Seo and Young & Hei Yoo have established a violation of sections 1703(a)(1)(A) and (B) and 1703(c) of the ILSFDA and that rescission would restore the parties to the *status quo ante*. However, those plaintiffs have failed to prove that those violations were

material or, in other words, that they would have influenced a reasonable purchaser's decision to enter into the contract for sale.

2. The claims asserted by Yang Bae, Rahul Chaudhry, Raj Chaudhry, Dustin Han & Ae Lee and Chris Patten should be dismissed based on their failure to appear at the evidentiary hearing and there being no evidence introduced during the hearing to support their claims for relief.

3. The claims asserted by Tia Johng should be dismissed since she has assigned her rights in this claim and she has no remaining interest in this lawsuit.

4. The plaintiffs have established that each of the defendants, including Uniwest Development LLC, would be liable for any judgment entered in this action.

5. The defendants have failed to present sufficient evidence to support their affirmative defenses of laches, equitable estoppel and unclean hands.

### Notice

By means of the Court's electronic filing system, the parties and the public are notified that objections to this report and recommendation must be filed within fourteen (14) days of filing of this report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(C) and a failure to file timely objections waives appellate review of the substance of the report and recommendation and waives appellate review of any judgment or decision based on this report and recommendation.

Entered this 2nd day of September 2010.

/s/
John F. Anderson
United States Magistrate Judge
United States Magistrate Judge

Alexandria, Virginia